IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

**GUNTERSVILLE BREATHABLES, INC.**

        **Plaintiff,**

v.                                                                                CV 05-PT-2630-M

**JOHN COLLIER**

        **Defendant.**

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

This case began by the filing of a complaint in state court. After the state court had entered a temporary restraining order, the defendant removed the action to this court. This court has, by separate order, denied the plaintiff's motion to remand. The cause came on to be heard on January 19, 2006 on the plaintiff's application for preliminary injunction.

### Facts

The defendant was employed by the plaintiff on December 1, 2004. He remained employed by the plaintiff until October 18, 2005, at which time he submitted his resignation. The resignation came one day before a scheduled meeting between defendant and his superiors at plaintiff's office in Guntersville, Alabama.[1]

Defendant's job title was "Vice-President Product Development." He was never elected as a vice-president by the plaintiff's board of directors. He requested that title to impress vendors, customers, etc. with whom he might have contact. He was, at least, a manager of a

---

[1] The meeting was scheduled after the plaintiff received information which might have led to defendant's discharge. *See infra*.

work area. He retained the same job and title during his tenure.

Defendant's initial "compromise" salary was $6,500.00 per month.[2] Apparently, his initial performance was creditable since he received a 10% raise during the summer of 2005.

At some time, the defendant became dissatisfied with his job and began to contemplate resigning and began preparing for work after such a resignation. This is evidenced by a series of e-mails and other communications which began at least by August 1, 2005.[3] His plans and preparations escalated up until the time of his resignation.

During his period of employment, the defendant began to contact firms, with whom the plaintiff did business, about financing or otherwise being involved in venture(s) that the defendant had in mind. See PX-9, PX-10 and PX-11 with regard to contacts with "CTM." Also see PX-12 (Derekduck); PX-13, PX-15, PX-16, PX-17 (Tredegar); and PX-14, PX-14, (Paul Marks ?)[4]

PX-17 (duplicated by PX-20) involves Columbia Sportswear, a potential competitor of the plaintiff. Note the reference in PX-17 to four companies, all of whom had ties or potential ties to the plaintiff. PX-21, PX-22, PX-23 and PX-24 indicate active discussions with Derekduck. Although, there is no evidence that the defendant has ever received any commissions from any firms who were dealing with the plaintiff, these exhibits do reflect an active discussion of potential commissions at some time.

PX-25, PX-26, PX-27, PX-28, PX-29, PX-30 and PX-31 reflect further dealing involving

---

[2]There was a potential for extra commission income. This resulted in only a nominal amount.

[3]There had apparently been some discussions with Chris Pardue before then. PX-4. Also see PX-26.

[4]PX 14 includes a prospective profit and loss statement for a potential firm named "Rainwater International."

defendant, a Chinese company (not Derekduck) and Pardue. Potential commissions to defendant are discussed.

PX-32 and PX-33 indicate further dealings, possibly involving Columbia Sportswear.

PX-34 references a Coleman company as to which the plaintiff's president had attended a meeting and with whom he had an interest in establishing a relationship.

Further discussions and self dealings by the defendant are indicated by PX-35 through PX-50. PX-52 is a contact with Derekduck.[5] It has this revealing language from the defendant: "Do not give [plaintiff] exclusive on anything including 3 layer fabric. If he ask about exclusive on 3 layer fabric that you promised me [while still employed by plaintiff], please tell him that offer was to me personally, if you are OK with that."

One of the more telling evidences of self dealing is an attachment to an e-mail marked as PX-13. It is dated October 10, 2005 and is a summary of a business plan and proposal which had been being developed by the defendant over at least a short period of time. It indicates that the business was to be called Rainwear International involving non-woven fabrics to be supplied by Tredegar. It also references potential competitors and customers of the plaintiff.

There is no evidence, at this state, that any of the plans or proposals of the defendant have materialized, other than his having been hired as a consultant by Falcon for a short period before the state TRO was entered. The defendant is presently unemployed and there is no evidence that he has consummated, at this state, any definite business arrangements or agreements with anyone, other than the short relationship with Falcon.

---

[5]It is not totally clear whether the termination was effective October 18 or October 31. The e-mail is dated October 19, the day after the resignation letter.

The hallmark of the plaintiff's business is rainwear manufactured from a three layer non-woven fabric. During the defendant's tenure with the plaintiff, the defendant had no fully developed active competitors for this product. Essential to the plaintiff''s business, in addition to sales, was to maintain sources to supply the fabric and to cut and sew the product. It preferred to have some exclusive agreements with such suppliers.

There is no question that, for at least a 2+ month period prior to his termination, the defendant engaged in substantial self dealing regarding preparations to engage in his own non-woven fabric business. This was without the knowledge or consent of the plaintiff. There was no non-compete agreement between the plaintiff and the defendant. The defendant never signed a confidentiality or non-disclosure agreement applicable to himself. There has been no substantial proof of any trade secrets, unless general operating plans and procedures and pricing can be considered. There is a reasonable inference that defendant's self dealing could have had some impact on the relationships between the plaintiff and firms with which it did business. There is no presently measurable loss to the plaintiff, nor measurable gain to the defendant.

## Issues

The issues include:

(1) Did the plaintiff's communications and activities during the latter stages of his tenure result in any actionable wrongs?

(2) If the answer to (1) is "yes," do those wrongs entitle the plaintiff to any injunctive relief with regard to post termination activities?

## Requirements for Injunctive Relief

4

These requirements are well established. They are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs the damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, will not be adverse to or harm the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## CONCLUSIONS OF THE COURT

There is little question that defendant's self-dealing, albeit during only a short period of his employment, was an actionable violation of his fiduciary duty as an agent of the plaintiff. His actions went beyond mere intent to resign and start a business of his own. He used his position with the plaintiff and his contacts with firms that did business with the plaintiff to start establishing his prospective business. Alabama cases, as also enunciated by the Eleventh Circuit, establish that his activities violated his fiduciary duties.

In *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991) the court stated:

> It is an agent's duty to act, in all circumstances, with due regard for the interests of his principal, and to act with the utmost good faith and loyalty. Implicit in this duty is an obligation not to subvert the principal's business by luring away customers or employees of the principal, or to otherwise act in any manner adverse to the principal's interest. In light of that duty, we agree with the trial court that there remain genuine issues of material fact regarding the extent of the defendants' solicitations of employees, vendors, and customers of Allied. Therefore, it was not error to deny summary judgment on those issues.

(Internal citations omitted).

In *James A. Head & Company v. Rolling*, 90 So. 2d 828, 839-841 (Ala. 1956) the court stated:

> The law on this subject has been stated variously by many courts. A very good statement appears in one of our cases, which is not cited by either party. In *Scottish Union & National Insurance Co. v. Dangaix*, 103 Ala. 388, 15 So. 956, 958, this court said:
>
>> 'It is a principle of universal prevalence, that an agent must not put himself, *during the agency*, in a position which is adverse to that of his principal...'
>>
>> . . .
>
> Appellant insists that those cases are inapplicable to the instant case where it was suppliers instead of customers who were solicited. Neither party to this cause has cited a supplier case to us. We think the same law should be applicable whether the case be that of a 'customer' or a 'supplier.' This court has long recognized the relationship of an agent to his principal as a fiduciary one.

In *L.A. Draper and Son, Inc. v. Wheelabrator-Frye, Inc.*, 813 F.2d 332, 337-338 (11th Cir. 1987) the court stated:

> Alabama law clearly states that once an agent has terminated his agency, if he acts in good faith and without fraud, he can engage in competition with, and even to the injury of, his former principal.
>
> . . .
>
> However, the law makes clear that his right of competition does not arise *until the agent has terminated his position of trust* with his principal. An agent intending to go into business for himself is entitled to make preparations for doing so while still an agent, but courting the suppliers of one's employer is not permissible preparation.
>
> . . .
>
> The record here indicates that Hester did approach Ladsco suppliers about selling their product *before* he had actually terminated his employment with Ladsco. Hester admits that in his own testimony, and WF document confirm this fact. The evidence shows that Hester, while employed by Ladsco, initiated the contacts, and Ladsco funds to pay for trips during which he solicited Ladsco suppliers for his own soon-to-be-formed company.
>
> . . .

> Evidence in this record, specifically Hester's testimony and business records obtained from Ladsco's suppliers, makes it clear that Hester did in fact solicit business for himself, using his expense account to do so, while employed by Ladsco. This is clearly actionable under Alabama law.

*Backstab: Competing With The Departing Employee*, 29 Cumb. L. Rev. 615, 625-628 (1998-1999) states:

> Notwithstanding the employee's right to engage in acts in preparation for competing with his employer during his employment, the law is clear that he may not actively and secretly compete with his employer prior to the termination of employment.
>
> In particular, he may not secretly "solicit" customers or prospective customers of the employer for his competing business. Likewise, the employee may not solicit customers to withhold their patronage until the employee's new business is established. [FN55] In addition, he is prohibited from attempting to solicit the employer's vendors and suppliers during his employment. In general, the employee must refrain from outside, adverse employment and interests.
>
> . . .
>
> Therefore, an employee considering leaving his employment to join a competitor or to open up a competing business would be wise to avoid the appearance of impropriety by refraining from directly discussing his intention of leaving, or even the possibility of leaving, with prospective or current customers and suppliers of his employer. He should certainly avoid any discussions with those customers which involve the potential transfer of business from the employer.
>
> The Restatement (Second) of Agency § 393 states:
>
> Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of the agency. [Comment] e. *Preparation for competition after termination of agency.* After termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principals to matters for which he has been employed. *See § 396.* Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before

> the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

Although it appears clear that defendant violated his duty to act in good faith toward his employer, Alabama law is not as clear with regard to whether there is any post termination remedy other than possible money damages. Here, plaintiff's likelihood of recovering any damages other than nominal damages is highly questionable. Under such circumstances it is unlikely that Alabama law would leave the plaintiff without any significant remedy. This is suggested by the following persuasive quotations:

> The court in [*L. A. Draper & Son v. Wheelabrator-Frye, Inc.*, 813 F.2d 332, 338 (11th Cir. 1987)] also stated that in cases of breach of an employee's fiduciary duty, Alabama law supported the imposition of a constructive trust "on proceeds obtained in violation thereof,"...The effect of the constructive trust would be to require the agent-employee to pay over ill-gotten net profits produced by the corporate opportunity.
>
> **Where monetary damages cannot adequately compensate the employer, courts around the country have also granted employers injunctive relief to give the employer time to restore its competitive edge and to prevent further damage to its economic position. It is at least arguable that Alabama law would authorize the employer to recover damages and obtain injunctive relief.**

*Backstab: Competing With The Departing Employee*, 29 Cumb. L. Rev. at 641-642 (emphasis added) (internal citations omitted).

> The court found that the defendant solicited customers for his own business before his employment with the plaintiff was terminated. Such action was in direct competition with his employer and was contrary to the employer's interest. It was a betrayal of the employer's trust and confidence in the defendant. He is not entitled to the benefits resulting from this unlawful conduct, and he should account to the plaintiff for the profits received from any business done with former

8

> customers of the plaintiff who were solicited by him while he was in its employ. Moreover, the plaintiff is entitled to injunctive relief restraining the defendant from performing, either directly or indirectly, any service, in competition with the plaintiff, for any former customers of the plaintiff who were solicited by him prior to the termination of his employment.

*Town & Country House & Homes Service, Inc. v. Evans*, 189 A.2d 390, 393 (Conn. 1963).

> If such a driver-salesman on a milk route, while still an employee, has solicited customers in contemplation of commencing his own business, his employer is entitled to enjoin him from further soliciting or selling to such customers for a sufficient length of time to permit the employer to compete on even terms.

*Equipment Advertiser, Inc. v. Harris*, 136 N.W. 2d 302, 306-307 (Minn. 1965).

> Neither an unqualified statement of rights or powers, nor an unqualified grant of authority in this chapter, shall be taken or construed to abrogate, repeal, displace, modify or impair the *fiduciary obligations* of directors or other *officers or employees* of a corporation or of shareholders having or exercising control thereof, or any function thereof, whether by reason of ownership of a majority, or other controlling, interest therein, or otherwise, or *the jurisdiction of courts to grant relief by way of injunction* or otherwise *in order to* forestall, prevent, correct, *remedy* or allow damages for fraud, oppression, imposition or other inequitable or remedial conduct *in conformity with the applicable principles and practices of law.*

Ala. Code § 10-2B-8.31 (1975) (emphasis added).

The court concludes that Alabama courts would hold that post termination injunctive relief is an available remedy.

The court next considers the requirements for the court's granting injunctive relief.

The court concludes that:

(1) There is a substantial likelihood that the plaintiff will ultimately prevail on the merits, at least as to nominal damages and some injunctive relief. *See L.A. Draper and Son, Inc., supra.*

(2) That the plaintiff will suffer irreparable damage unless an injunction issues because there

are not likely any measurable money damages and the plaintiff is entitled to some remedy.

(3) The threatened injury to the movant if there is not some remedy outweighs the damage the proposed injunction may cause the defendant.

(4) The granting of a preliminary injunction will not be adverse to or harm the public interest. The court will enter a preliminary injunction.

The court recognizes that the injunction which the court will enter as to having contact with firms who did business with the plaintiff during the defendant's employment will likely be for the same period as any permanent injunction on this basis might issue. There is, however, no choice if there is to be any remedy for this facet of the case. The court will balance the equities in this regard.

This 31st day of January, 2006.

*/s/ Robert B. Propst*
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**